UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE ) | |
| RESIDENCE OF THOMAS ROBERTSON, ) | Case No. ___7:21mj83___ |
| LOCATED AT 1765 OTTER DRIVE, ) | |
| FERRUM, VIRGINIA, 24088 ) | |
| ) | FILED UNDER SEAL |
| & ) | |
| ) | |
| HIS PERSON IF LOCATED WITHIN THE ) | |
| WESTERN DISTRICT OF VIRGNIA ) | |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

**Introduction**

Your affiant, Kathryn Camiliere, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed by the FBI since May 1, 2016. I have a Bachelor's Degree from the United States Military Academy, and a Master's Degree from King's College in London. I have extensive training and experience in the areas of terrorism investigations and white collar crime, as well as interview and interrogation techniques, evidence recovery, source recruitment, and cellular phone analysis.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      This affidavit is made in support of an application for a search warrant for the following location (hereinafter "**SUBJECT PREMISES**"): **1765 Otter Drive, Ferrum, VA,**

**24088** which is further described and depicted in Attachment A, as a one story brick family home and an out-building, as observed during a previously-executed search warrant (case number 7:21-mj-9) at the **SUBJECT PREMISES**.[1]   The items to be searched and seized are described in the following paragraphs and in Attachment B.

4.     Based on my training and experience and the information set forth herein, your Affiant has probable cause to believe that THOMAS ROBERTSON (hereinafter referred to as "Robertson" or "the defendant") engaged in violations of 18 U.S.C.   §§ 922(n), and that evidence, fruits and instrumentalities related to these violations, (as further described in Attachment B), may be found at the **SUBJECT PREMISES**.

5.     This affidavit is based upon information that I have gained from my investigation, my training and experience, as well as information gained from conversations with other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities (more precisely described in Attachment B) of violations of 18 U.S.C. § 922(n) are located at the **SUBJECT PREMISES** (as further described in Attachment A).

6.     This investigation involves evidence, fruits, and instrumentalities of offenses which are located within the jurisdiction and proper venue of the United States District Court for the Western District of Virginia, as more fully articulated herein.

---

[1] This affidavit incorporates by reference the facts provided in the affidavit for search warrant 7:21-mj-9.

**Pertinent Federal Criminal Statutes and Definitions**

7.      This investigation concerns alleged violations of 18 U.S.C. § 922(n), which makes it a crime for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**Probable Cause**

**The Pending Charges Against the Defendant**

8.      On January 12, 2021, a Magistrate Judge in the District of Columbia found probable cause that Robertson committed violations of 18 U.S.C. § 1752 and 50 U.S.C. § 5104 during the January 6, 2021 riot at the U.S. Capitol in Washington, D.C., and an arrest warrant was issued. The defendant was taken into custody on Wednesday, January 13, 2021, in the Western District of Virginia, and was released subject to certain conditions, including a ban from any public protest or demonstration anywhere, that he not violate any federal, state, or local law while on release, and that he refrain from possessing a firearm, destructive device, or other dangerous weapon. Robertson was also ordered to relocate any firearms in his home by January 15, 2021.  Nevertheless, law enforcement discovered firearms at the **SUBJECT PREMISES** during the execution of a search warrant; the search warrant was issued pursuant to Fed. R. Crim. P. 41 on January 18, 2021, case number 7:21-mj-9. The search itself took place on January 19, 2021.  Law enforcement seized the following weapons from the **SUBJECT PREMISES** that day:

    a.   Glock 17, Serial Number ending in 064

3

b.  Glock 21, Serial Number ending in 985, with attached Streamlight TLR-1

c.  Glock 19, Serial Number ending in 260 along with a Galco leather holster K109L

d.  Smith and Wesson, Serial Number ending in 106

e.  Daniel Defense, Serial Number ending in 55D, with LaRue Tactical optic and Surefire light

f.  Radical Firearms, Serial Number ending in 711

g.  Springfield Armory 1903, Serial Number ending in 427

h.  Hawken Rifle, Serial Number ending in 639

9.      During the execution of the search warrant, law enforcement officers searched an out-building located on the property. During the search of the out-building, officers noted large amounts of ammunition, as well as what appeared to be equipment used for re-loading ammunition. It is unknown when this ammunition/re-loading equipment was shipped, transported, or received.  A photograph of the out-building from the search warrant is below.



10.     On January 19, 2021, Robertson appeared before Magistrate Judge G. Michael Harvey in the District of Columbia and was ordered not to possess a firearm, destructive device, or other dangerous weapon.  Judge Harvey set a status date for the ascertainment of counsel for February 2, 2021.

11.     On January 29, 2021, a grand jury in the District of Columbia charged Robertson with violations of 18 U.S.C. §§ 1512, 2 (Obstruction of an Official Proceeding, and Aiding and Abetting), 1752(a)(1) (Entering and Remaining in a Restricted Building), 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building), and 40 U.S.C. § 5104 (Violent Entry and Disorderly Conduct in a Capitol Building or Grounds).  The violation of 18 U.S.C. § 1512 is a felony offense punishable by a term of imprisonment of more than one year.

12.     On February 2, 2021, Robertson appeared before Magistrate Judge Robin M. Meriweather in the District of Columbia for a hearing on the ascertainment of counsel and arraignment. Robertson appeared at the hearing with his current counsel—who advised the Court that he had briefly spoken with Robertson about the indictment—and entered a plea of not guilty.

13.     On February 25, 2021, the defendant was arraigned on the charges in the Indictment before the Hon. Christopher R. Cooper, U.S. District Judge in the District of Columbia.  The defendant acknowledged having read the Indictment, as well as having reviewed it with his attorney, before pleading not guilty to the charges in the Indictment. The Court did not advise Robertson as to the maximum punishments associated with the charges. The defendant orally moved to modify his conditions of release to allow for his possession of firearms,[2] and

---

[2] The defendant's co-defendant orally made the motion and argued it, which Robertson orally joined.

Judge Cooper reserved his ruling on the motion. In opposing the motion, the government referenced that this was a felony case. Through the present date, the defendant's conditions of release remain unchanged.

### Evidence of Robertson's Unlawful Post-Indictment Conduct Involving the Purchase, Sale, and Possession of Firearms and Ammunition

14.     On February 17, 2021, in connection with the FBI's on-going investigation into Robertson's involvement in the riot at the U.S. Capitol, a Magistrate Judge in the District of Columbia issued a search warrant for Robertson's Yahoo email account, ███████@yahoo.com, in case number 21-sc-552. In the course of reviewing the information disclosed consistent with that warrant, and a subsequently obtained warrant, the undersigned identified information indicating that Robertson was involved in the purchase, sale, and possession of firearms and ammunition in the time *after* his indictment for a felony violation of 18 U.S.C. § 1512, while he was on pre-trial release in this case, including the following information:

15.     On February 13, 2021, the ███████@yahoo.com account received an email that was "Generated from: ar15.com"; the email requested that the recipient reply to ███████@gmail.com[3] and stated "Hey Tom…I sold you the M855A1… if you're interested, or know anyone that is, I have more M85561 available as well as M80A1."

---

[3] The website ar15.com has multiple discussion forums, to include forums pertaining to AR15s and handguns, as well as at least one sub-forum dedicated to ammunition. Your affiant believes that the user of ███████@gmail.com sent a message to Robertson on ar15.com, and that the settings on ar15.com caused the message to either be forwarded/send an alert to the subject account. Following this alert, your affiant believes ███████@gmail.com and Robertson began corresponding through email as opposed to through ar15.com itself.

16.     Based on my training and experience, I know that M855A1 and M80A1 are designations for ammunition used in semi-automatic and automatic weapons.

17.     On February 13, 2021, the ██████████@yahoo.com account replied to ██████████@gmail.com saying "I absolutely am interested. Price and quantity?" On the same day, ██████████@gmail.com replied, in part "I have 1000 rounds on stripper clips of M855A1 $1800 shipped insured. I have 2000 rounds loose (delinked) M80A1 $10k shipped or 1000 rounds $5k shipped insured."

18.     On February 14, 2021, the ██████████@yahoo.com account replied to ██████████@gmail.com, stating that he would take the "855a1" and that he "can do venmo, zelle, or MO."   A follow-up message from the ██████████@yahoo.com account noted that paypal "suspended [his] account because someone felt the need to put gun stuff in an email…"

19.     In additional messages, the ██████████@yahoo.com account agreed to pay $3,600 for 2000 rounds of "855A1" and provided the following information for his address: "TJ Robertson, 1765 Otter Drive, Ferrum, VA. 24088." The seller then confirmed they received this payment.

20.     According to records received from Venmo, Robertson paid $3600 to the person using the email account ██████████@gmail.com on February 14, 2021. The notes associated with the transaction indicate that the payment was for "Wedding Photos." On the same day, the ██████████@yahoo.com account sent an email to ██████████@gmail.com saying "Venmo sent"; the message included a screenshot of Venmo that stated, in part, "You paid ██████████ The screenshot also showed "-3600," indicating that the payment was sent by Robertson, and that the payment was for "Wedding Photos."

21.     On February 15, 2021, the ▇▇▇▇▇▇@yahoo.com account received an email from iShip_Services@iship.com. The email stated, in part, "A carrier shipping label has been generated for the shipment to TJ Robertson and is at UPS CC EAGAN MN awaiting carrier pickup. It will be picked up by UPS from UPS CC EAGAN MN on Monday, February 15, 2021." The recipient was listed as TJ Robertson in Ferrum, VA, and the sender was listed as ▇▇ ▇▇ in Eden Prairie, MN. The package weighed 60 pounds, and the expected delivery date was listed as February 18, 2021.

22.     On February 14, 2021, "Julieann & TJ Robertson," from the ▇▇▇▇▇▇@yahoo.com account, received an email from ▇▇▇ ▇▇▇▇ at ▇▇▇▇▇@gmail.com with the subject line "Re: M4" in which ▇▇▇▇ stated, "haven't been able to get it shipped yet [...] I'm not going to leave something like that on my porch for a pick-up. I have an appointment this week with the FFL[4] I use and he will ship it for me."  "Julieann & TJ Robertson" replied from ▇▇▇▇▇@yahoo.com account, writing that there was "Literally no hurry…seriously, Just looking for an update. No problem with me."

23.     Based on my training and experience I know that an "M4" is a type of rifle used by the U.S. military.

24.     Your affiant is aware that on January 18, 2021, ▇▇▇▇▇@yahoo.com sent an email to ▇▇▇▇▇▇ stating "Please find attached." Attached to the email was a PDF with what appeared to be a scanned copy of a Federal Firearms License (FFL); the designated licensee was Tactical Operations, Inc., 1346 Blue Ridge Boulevard, Roanoke, VA 24012.

---

[4] Based on my training and experience, I am aware that "FFL" is a likely reference to a "Federal Firearms License", a license that, in part, allows for a business or company to engage in the interstate or intrastate sale of firearm.

25.     Separately, on February 2, 2021, ███████@yahoo.com sent an email to "███████", ███████@sbcglobal.net, saying "please find attached." Attached to the email was a PDF with what appeared to be a scanned copy of a Federal Firearms License; the designated licensee was Tactical Operations, Inc., 1346 Blue Ridge Boulevard, Roanoke, VA 24012.

26.     Your affiant requested and received records from the website Gunbroker.com[5].

27.     From the records received from Gunbroker.com, your affiant learned that Robertson made multiple orders from the website after he was indicted for a violation of Title 18, United States Code, Section 1512.[6] These orders include, but are not limited to, the following:

    a.  On May 16, 2021, Robertson ordered a "1955 Springfield  Arms M1 GARAND Korea US ARMY rifle 1903 H&R" for $1,950; this item is required to be shipped to an FFL. According to GunBroker.com records, this item was shipped from Snellville, Georgia. No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

    b.  On May 13, 2021, Robertson ordered a "WWI  US Eddystone Model 1917 .30-06 Rifle 1918mfg" for $844; this item is required to be shipped to an FFL. According to GunBroker.com records, this item was shipped from Hopedale, Massachusetts.

---

[5] According to its own website, Gunbroker.com claims to be the "world's largest online auction site for firearms and hunting/shooting accessories. The GunBroker.com website provides an informative, safe and secure way to buy and sell firearms, ammunition, hunting gear, shooting accessories, vehicles, collectibles, and much more online."

[6] As described in Paragraphs 11-13, Robertson was indicted on January 29, 2021 and subsequently entered a plea of not guilty in February 2021.

No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

c.  On May 4, 2021, Robertson ordered a "Finnish Mosin Nagant 7.62x54R Finland" for $800; this item was shipped to "Thomas Robertson" at 1765 Otter Drive, Ferrum, VA from Highland, California.

d.  On May 3, 2021, Robertson ordered a "Finnish M39 Mosin Nagant 7.62x54R Finland M39 1944" for $845; this item was shipped to "Thomas Robertson" at 1765 Otter Drive, Ferrum, VA from Highland, California.

e.  On April 30, 2021, Robertson ordered a "Bandolier of US Spec AYR Armor Piercing Ammunition – 48 Rounds 30 06" for $145; this item was shipped to "Thomas Robertson" at 1765 Otter Drive, Ferrum, VA from Huntsville, Alabama.

f.  On April 29, 2021, Robertson ordered a "WWII MILITARY ROCKOLA M1 CARBINE SEMI AUTO RIFLE 30US" for $1,075; this item is required to be shipped to an FFL. According to GunBroker.com records, this item was shipped from Whitefield, Maine. No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

g.  On April 29, 2021, Robertson ordered ".30 06 AP Armor Piercing AYR spam can 192 rds on Garand clips in bandos" for $500; this item was shipped to "Thomas Robertson" at 1765 Otter Drive, Ferrum, VA from Newfane, Vermont.

h.  On April 28, 2021, Robertson ordered "M61 Armor Piercing Projectiles 7.62x51 .308 Win 400 count" for $155; this item was shipped to "Thomas Robertson" at 1765 Otter Drive, Ferrum, VA from Tucson, Arizona.

i.  On April 27, 2021, Robertson ordered a "Springfield Armory M1 Garand" for $1,350; this item is required to be shipped to an FFL. According to GunBroker.com records, this item was shipped from Columbus, Georgia. No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

j.  On April 25, 2021, Robertson ordered a "M1 Garand Receiver" for $250; this item is required to be shipped to an FFL. According to GunBroker.com records, this item was shipped from Dalton, Ohio. No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

k.  On April 21, 2021, Robertson ordered a "US International Harvestor M1 Garand" for $1,550; this item is required to be shipped to an FFL. According to GunBroker.com records, this item was shipped from Vero Beach, Florida. No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

l.  On April 19, 2021, Robertson ordered a "CMP M1 Garand Unissued" for $1,500; this item is required to be shipped to an FFL. According to GunBroker.com records, this item was shipped from Conyers, Georgia. No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

m. On April 13, 2021, Robertson ordered a "INLAND GENERAL MOTORS U.S. MILITARY M1 CARBINE 30US SEMI-AUTO RIFLE" for $995; this item is required to be shipped to an FFL. According to GunBroker.com records, this item

was shipped from Whitefield, Maine. No "Ship To" address or name was included in the records, though Virginia was listed as the "Ship To State."

n.  On April 12, 2021, Robertson ordered "Armor Piercing Ap / Black Tip 192 Round Sealed Spam Can" for $530; this item was shipped to "Thomas Robertson" at 1765 Otter Drive, Ferrum, VA from McKinney, Texas.

For each of these orders, the purchased item was shipped from a location that is outside the state of Virginia.

28.     Title 18, United States Code, Section 922(n), makes it unlawful for any person under indictment for a crime punishable for a term exceeding one year to ship or transport in interstate commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.  Robertson was indicted on January 29, 2021 for violating 18 U.S.C. § 1512, a crime punishable for a term exceeding one year and was subsequently arraigned and pleaded not guilty to that charge in February 2021. Accordingly, as set forth herein, there is probable cause to believe that Robertson violated 18 U.S.C. § 922(n), and there is also probable cause to search the premises described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

**Probable Cause to Search the Subject Premises for Evidence of Robertson's Unlawful Post-Indictment Conduct Involving Firearms**

29.     Law enforcement database checks confirmed that Defendant Robertson resides at the **SUBJECT PREMISES**, which is his home of record on his Driver's License.

30.     As discussed in the paragraphs above, Robertson was arrested on a criminal complaint on January 13, 2021, and released on conditions that included a prohibition on his

possessing a firearm, destructive device, or dangerous weapon. In addition, Robertson was ordered to relocate any firearms in his home by January 15, 2021. Nevertheless, law enforcement discovered firearms at the **SUBJECT PREMISES** during the execution of a search warrant issued pursuant to Fed. R. Crim. P. 41 on January 19, 2021.

31.     As discussed in the paragraphs above, Robertson was indicted on a felony violation of 18 U.S.C. § 1512 by a federal grand jury in the District of Columbia on January 29, 2021.

32.     Based on my training and experience, and information I obtained through this investigation, I know that individuals who purchase and sell firearms and/or ammunition unlawfully often keep those items, and records relating to the purchase and sale of those items, in their primary residences.  Indeed, in this case, based on both email and purchase records, there is probable cause to believe that physical and/or electronic evidence of the commission of the above-described offenses will be found at the **SUBJECT PREMISES**, including weapons, ammunition, and physical and digital purchase records. Additionally, as described above, a search of an out-building on the **SUBJECT PREMISES** revealed the presence of a large amount of ammunition and what appeared to be ammunition re-loading equipment. In my training and experience, I know that individuals often keep firearms in close proximity to ammunition, such as the ammunition located in the out-building.

33.     Based on my training, experience and information I obtained through this investigation, I know that individuals who purchase and sell firearms and/or ammunition online use digital devices to complete these transactions.  I also know that records of these transactions may be stored on the individual's digital devices, including smartphones, tablets, laptop

computers, external storage media, and other digital devices, and that these devices are often stored in the user's primary residence or on the user's person.

34.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.   One form in which the records might be found is data stored on a digital device (including a smart phone), a computer's hard drive or other storage media.   Thus, the warrant applied for would authorize the seizure of digital devices, electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

**Additional Request to Search the Person and Vehicle of Robertson**

35.     It is common for investigative subjects and evidence of interest to be absent from the place to be searched but still in the local area when law enforcement executes a search warrant. It is expected that Robertson will not be present at the **SUBJECT PREMISES** during the execution of the requested search warrant and that he will depart the residence in a motor vehicle.

36.     Your affiant is aware that individuals commonly maintain electronic devices on their person and in their vehicles when they leave their residence. This is especially true of devices that may contain contraband or are utilized for criminal activity. Moreover, in cases involving electronic evidence, it is critical to locate and obtain that evidence before the subject becomes aware of law enforcement's intentions to seize and search to prevent such evidence from being hidden, destroyed, or otherwise altered.

14

37.     Therefore, if agents positively locate and identity Robertson outside the residence to be searched, or in a public place or within a motor vehicle or other conveyance located within the Western District of Virginia, your affiant requests the following authorization:

    a.  To briefly detain Robertson to search his person; or

    b.  If Robertson is encountered in a vehicle, to search portions of the vehicle Robertson has reasonably control over, or access to, for the items listed in Attachment B of this application. For example:

        i.  If Robertson has the keys to and is operating a vehicle that he has clear use, dominion and control over, then it would be reasonable for Agents to search for items within all areas of the vehicle including the passenger compartment, trunk and personal containers found within.

        ii.  If Robertson is encountered as a passenger in a vehicle that he is a guest in and does not have dominion and control over, then it would be reasonable for Agents to search for items within areas of the vehicle Robertson has access to including the passenger compartment or his personal containers found within.

**Background on Digital Devices and Storage Media**

38.     I submit that if a computer or storage medium is found on the **SUBJECT PREMISES, PERSON, OR VEHICLE**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file

15

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

39.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

16

cause to believe that this forensic electronic evidence will be on any storage medium in the **PREMISES** because:

e. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of

17

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a

digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      i.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

40.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

      j.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the

warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

k.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

l.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

41.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

42.   Because several people share the **PREMISES** as a residence, it is possible that the **PREMISES** will contain storage media that are predominantly used, and perhaps owned, by

persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

### Request to Use Biometric Features to Unlock a Locked Device

43.     The warrant I am applying for would also permit law enforcement to obtain from an individual the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based upon the following: I know from my training, experience, and research that encryption systems for mobile phones and other electronics protect the devices from unauthorized users and render the contents unavailable to unregistered users. These include one-touch encryption or deletion functions, standard screen lock with passcode, fingerprint or facial recognition access or other features. As the electronic protections for technology become more enhanced, the ability of law enforcement to access devices and evidence within is often reduced.

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

22

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are

considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

44.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

25

### Conclusion

45.     Based on the facts set forth above, your affiant respectfully submits that there is probable cause to believe that **THOMAS ROBERTSON** engaged in violations of 18 U.S.C. § 922(n).  Furthermore, there is probable cause that evidence, fruits and instrumentalities of these violations (described with more specificity in Attachment B to this affidavit) are presently located at the **SUBJECT PREMISES**, as depicted in Attachment A to this affidavit, including any outbuildings, sheds, garages and/or vehicles that are on the premises.

46.     Accordingly, your affiant respectfully requests that the Court issue a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure authorizing FBI agents and representatives of the FBI, with assistance from representatives of other law enforcement agencies as required, to search 1765 Otter Drive, Ferrum, Virginia, 24088, (more precisely described in Attachment A), for evidence, fruits, and instrumentalities (more precisely described in Attachment B).



Kathryn Camiliere
Special Agent
Federal Bureau of Investigation

Sworn and attested to by reliable electronic means (telephone) on June 28, 2021

_Robert S. Ballou_
HONORABLE  ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE

26